JN: NR/HM
F.#2020R00338

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA

   - against -

DONALD ALLEN and
MANUEL REVOLORIO,

                Defendants.

---------------------------------------------------X

To Be Filed Under Seal

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANTS

(T. 18 U.S.C. § 1349)

Case No. 20 MJ 318 (RLM)

EASTERN DISTRICT OF NEW YORK, SS:

        WILLIAM BOLINDER, being duly sworn, deposes and says that he is a

Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to

law and acting as such.

        1.      Upon information and belief, in or about and between March 2020 and

April 2020, both dates being approximate and inclusive, within the Eastern District of New

York and elsewhere, the defendants DONALD ALLEN and MANUEL REVOLORIO,

together with others, did knowingly and intentionally conspire to devise a scheme and artifice

to defraud one or more investors and buyers and potential investors and buyers of personal

protective equipment, including KN95 Filtering Facepiece Respirators (the "KN95 Masks"),

N95 Filtering Facepiece Respirators (the "N95 Masks") and 3-Ply surgical masks (the ("3-Ply

Masks"), and to obtain money and property from them by means of one or more materially

false and fraudulent pretenses, representations and promises, and for the purpose of executing

such scheme and artifice, to transmit and cause to be transmitted by means of wire

communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349)

The source of your deponent's information and the grounds for his belief are as follows:

2.      I am a Special Agent with the FBI, and have been in that position for more than one year.  I am currently assigned to a squad involved in investigating violations of the securities laws as well as of the mail and wire fraud statutes, among other crimes.  In the course of my work for the FBI, I have received training regarding the securities industry and financial fraud, as well as training regarding the means by which proceeds of such fraud may be laundered to conceal its origins and recycled in such a way as to continue the fraudulent activities that generated them.

3.      I have personally participated in the investigation of wire fraud conspiracy and willful hoarding and price gouging of designated scarce materials by the defendants DONALD ALLEN and MANUEL REVOLORIO, as discussed below.  I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents involved in this investigation and (c) my review of evidence including consensual recordings, e-mails and bank records as discussed below.

4.      Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents.  Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendants DONALD ALLEN and

MANUEL REVOLORIO, I have not set forth each and every fact learned during the course

of this investigation.  Instead, I have set forth only those facts that I believe are necessary to

establish probable cause for the arrest warrants sought herein.  In addition, where the contents

of documents, or the actions, statements and conversations of others are reported herein, they

are reported in sum and substance and in part, except where otherwise indicated.  Summaries

of recorded conversations are based upon draft transcripts of the conversations, which are

subject to revision.

<u>The COVID-19 Outbreak</u>

5.      In December 2019, a novel coronavirus, SARS-CoV-2 (the

"coronavirus"), was first detected in Wuhan, Hubei Province of the People's Republic of

China ("PRC"), causing outbreaks of the coronavirus disease COVID-19 that have since

spread globally.  On January 31, 2020, the Secretary of Health and Human Services ("HHS")

declared a national public health emergency under 42 U.S.C. § 247d as a result of the spread

of COVID-19 to and within the United States.  On March 11, 2020, the Director-General of

the World Health Organization ("WHO") characterized COVID-19 as a pandemic.  On March

13, 2020, the President of the United States issued Proclamation 9994 declaring a national

emergency beginning on March 1, 2020, as a result of the rapid spread of COVID-19 within

the United States.

6.      According to the Centers for Disease Control and Prevention ("CDC"):

Early reports suggest person-to-person transmission most
commonly happens during close exposure to a person infected
with COVID-19, primarily via respiratory droplets produced
when the infected person coughs or sneezes.  Droplets can land
in the mouths, noses, or eyes of people who are nearby or

possibly be inhaled into the lungs of those within close proximity.[1]

7.     Accordingly, CDC has issued guidance to health care providers recommending that they wear personal protective equipment ("PPE") to prevent the coronavirus from being transmitted by infected patients to healthcare providers.

8.     During the course of this investigation, I have learned that 3M is a major manufacturer of N95 Masks and similar respirators that comply with the N95 standard, which means the ability to block at least 95 percent of small particles.  3M had sold the 3M N95 series 1860 respirator mask (the "3M 1860") for $1.27 per unit prior to the COVID-19 pandemic, and has continued to sell the 3M 1860 at the same price per unit during the pandemic.  I have also learned that while KN95 Masks were not sold in the United States prior to the COVID-19 pandemic, a KN95 respirator manufactured by 3M under 3M designation number 9501 would most likely have been sold for approximately $0.75 to $1.00-per-mask, if not cheaper.  Finally, I have also learned that, before the COVID-19 pandemic, 3-Ply Masks similar to the masks involved in this investigation could be purchased by hospitals within the Los Angeles area for approximately between $0.14 and $0.18 each.

9.     Based on my training and experience, I know that typical wholesale prices for items of PPE, such as masks, are significantly lower than retail prices paid by the end user, such as a hospital.

---

[1]     See CDC, "Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings," https://www.cdc.gov/coronavirus/2019-ncov/infection-control/control-recommendations.html.

<u>Relevant Parties</u>

10.     The defendant DONALD ALLEN was a businessman in Southern California.  ALLEN was previously convicted of mail fraud in 2002 in the case of <u>United States v. Parker, et al.</u>, 02-CR-28 (DOC) (C.D.C.A. 2002).

11.     The defendant MANUEL REVOLORIO was a businessman in Southern California and the defendant DONALD ALLEN's business partner.

12.     International Commerce and Investment Group Inc. ("ICIG") was a company incorporated in California in September 2017 for the purported purpose of investing in real estate.  The defendant DONALD ALLEN was the agent for service of process and vice president of ICIG.  The defendant MANUEL REVOLORIO was the president of ICIG.

<u>Initial Investigation</u>

13.     On March 26, 2020, a business advisor ("Co-Conspirator-1") called a potential investor ("Investor-1")[2] about an opportunity involving 40 million N95 Masks and indicated that the masks could be sold for double or triple the purchase price.  Investor-1 was located in the Eastern District of New York at the time and had received numerous fraudulent investment proposals from Co-Conspirator-1 in the past, including a proposal for a "safe" investment purporting to return profits of 200% per month.  Investor-1 alerted the government to potential criminal activities and agreed to assist in this investigation.[3]

---

[2]     Investor-1 has previously been convicted of federal securities fraud and cooperated with the government.  Investor-1 served the sentence imposed by the Court and is no longer under Court supervision.

[3]     Investor-1 and Investor-2, identified below, took all of the actions described herein at the direction of the government.

14.     On March 27, 2020, Co-Conspirator-1 sent an email to Investor-1 regarding the potential purchase of the 40 million KN95 Masks, which appeared to contain materially false information designed to fraudulently induce Investor-1 and others to invest money.  Specifically, the email attached a brochure (the "Brochure") that contained purported certifications for the masks, including one referencing certification standard "BS EN 14683:2019" (the "Compliance Certificate").  The bottom of the Compliance Certificate stated: "The validity of this certificate can be verified at www.bqccert.com or through info@bqccert.com.  This certificate is the property of BQC certifications and must be returned on request.  Accreditation details are available with IAS (International Accreditation Service) Inc. USA, at www.iasonline.org."[4]

15.     The Brochure also had numerous typographical errors, several instances of missing spaces or extra spaces between words, and stamps, logos and signatures on the Compliance Certificate (and other certificates) that appeared to be low-resolution images contained within an otherwise high-resolution document.  Based on my training and experience, I believe that this indicates that the Compliance Certificate and other certificates in the Brochure had been altered.

---

[4]     On or about March 28, 2020, FBI special agents interviewed the president of International Accreditation Service ("IAS").  After having reviewed the Brochure, the IAS President provided the following information: (1) IAS was unable to locate the number listed on the Compliance Certificate; (2) the statement "Accredited by International Accreditation Service" at the bottom of the Compliance Certificate was false and misleading because IAS had nothing to do with certifying anything in the certificate; (3) the Compliance Certificate failed to state BQC's address as required by IAS standards; and (4) based on the foregoing information, the IAS President believed the Brochure to be an invalid document.

16.     On March 27, 2020, Investor-1 introduced Co-Conspirator-1 to an individual identified as a representative of wealthy investors ("Investor-2")[5].  Co-Conspirator-1 in turn introduced Investor-2 to an attorney acting as the "pay master" ("Co-Conspirator-2")[6] and two European businessmen who initially offered to sell millions of masks located in various countries for prices as high as $7.00 per mask, but ultimately advised that these masks were no longer for sale.

17.     On April 9, 2020, during a recorded call,[7] Investor-2 spoke with Co-Conspirator-1 and Co-Conspirator-2 about the various offers made by the European businessmen.  Co-Conspirator-1 advised that the European businessmen did not have any masks.  Co-Conspirator-2 then said that he had an alternate supply of protective masks located in the United States.  In a call later that day, Co-Conspirator-2 told Investor-2, in sum and substance and in part, that there were 1 million 3M KN95 Masks and 11 million 3-Ply Masks for sale and located in Los Angeles, California.  In another call that day, Co-Conspirator-2 indicated that he had spoken to a supplier who had 1 million masks in Los Angeles for sale at $3.80 per unit.  He further indicated that the masks were available in the supplier's physical possession "this minute" and that the masks were the "3M 95" masks.

---

[5]     Investor-2 has pleaded guilty to federal felony charges and is cooperating in hopes of receiving a reduced sentence.  Investor-2 has previously proven reliable and information Investor-2 has provided has been corroborated by independent sources, including documentary evidence and other, unrelated, witnesses.

[6]     Based on the investigation, I understand that as the "pay master," Co-Conspirator-2 was responsible for facilitating the payment of funds from the buyer of PPE to the seller and also for distributing any commission fees owed to any brokers involved in the transaction.

[7]     All calls referenced herein were recorded.

Co-Conspirator-2 then promised to obtain additional information from the supplier, who he identified as someone that he had worked with for "fourteen years." Co-Conspirator-2 also indicated that his supplier had 11 million "smaller masks" (3-Ply Masks) for $0.74 per mask.

<u>Investigation of the Defendants DONALD ALLEN and MANUEL REVOLORIO</u>

18.    On April 9, 2020, Co-Conspirator-2 introduced Investor-2 to the defendant DONALD ALLEN by telephone call. During the call, ALLEN informed Investor-2 that he had been doing "spot buys" of protective masks and "flipping" the purchased masks. ALLEN indicated that he had been purchasing masks for approximately $2.50 per KN95 Mask two weeks prior and that prices were jumping up to $3.25 per KN95 Mask. Investor-2 then inquired as to how much ALLEN was charging when ALLEN sold the masks. ALLEN informed Investor-2 that ALLEN had previously told Co-Conspirator-2 that the price was $3.80 per KN95 Mask, and further stated:

> Here's the deal, I'm not - I don't like to price gouge. I had some guys coming to me and they're saying, well, you do the billing, we'll do this, and then we'll sell them at $6.10 and I said, 'get off my phone.' Because who's the FBI going to knock on their door - not theirs, mine.

ALLEN indicated that he was seeking to sell the KN95 Masks at $3.80 per unit, which would represent earnings of $0.40 to $0.60 on the sale of each mask (a $400,000 to $600,000 profit for the 1 million KN95 Masks). ALLEN further indicated that the KN95 Masks were arriving from China and would be available on "Monday" (<u>i.e.</u>, April 13, 2020). Later that day, April 9, 2020, Co-Conspirator-2 sent an email to Investor-2,[8] stating:

---

[8] All of the emails referenced herein that were received or sent by Investor-2 were routed through a server maintained by Investor-2 and located within the Eastern District of New York.

> It was my pleasure to speak with you and Don Allen regarding
> the availability of the KN95 and 3 ply masks for your client.
> The price for the KN95 mask, FOB Los Angeles with
> availability of 1 million masks on Monday, April 13, 2020.  The
> 3 Ply masks are available for .75 cents per mask, with 11 million
> available FOB Los Angeles.

In that email, Co-Conspirator-2 provided wiring information for his trust account (the "Trust

Account") and "highly recommend[ed]" to Investor-2 that Investor-2 place the total purchase

price for the masks into escrow in the Trust Account.

19.     On that same day, April 9, 2020, after Investor-2 spoke with the

defendant DONALD ALLEN and Co-Conspirator-2 sent the above-referenced email, a new

domain name for ICIG, with the website address "www.iciginc.com," was registered (the

"ICIG Website").

20.     The ICIG Website contained multiple pieces of false and misleading

information.  For example, the ICIG Website falsely stated that ICIG had worked closely with

global traders, medical institutions, and general supply companies "[s]ince 2014."  ICIG was

not incorporated until September 2017 and, as set forth below, was not involved in the

medical supply business until approximately March 2020.  The ICIG Website also falsely

stated that ICIG had a large inventory (i.e., "We stock thousands of the products and brands

used in various professional industries"), and multiple distribution centers, (i.e., "Our

distribution centers play an essential part of the supply chain process"), when, in fact, ICIG

had neither a large inventory nor any distribution centers, as described below.  Moreover, the

ICIG Website home page and the "contact us" page listed a toll-free telephone number that,

when called, was answered by an automated message advertising an adult telephone service.

Based on my training and experience, I believe that the co-conspirators created the ICIG

Website to fraudulently induce Investor-2 and other potential investors and purchasers into believing ICIG was a legitimate operation that had existed for several years.

21.     On April 10, 2020, Investor-2 spoke with Co-Conspirator-2 on two occasions via telephone.  During these calls, Co-Conspirator-2 again suggested that Investor-2 "reserve" masks by depositing money into the Trust Account controlled by Co-Conspirator-2.

22.     On Saturday, April 11, 2020, Investor-2 received a telephone call from the defendant DONALD ALLEN.  During the call with Investor-2, ALLEN told Investor-2 that he had 20,000 KN95 Masks at a warehouse in Santa Ana, California, which was near his office.  ALLEN further stated that he had another 11 million 3-Ply Masks in El Monte, California, but that the warehouse where they were located was closed for the weekend, and ALLEN had not had a chance to view the 3-Ply Masks.  Investor-2 asked ALLEN if anyone had put down deposits to reserve any masks with Co-Conspirator-2.  ALLEN claimed that he had clients in Spain who were about to wire $24 million to Co-Conspirator-2's escrow account as a deposit to purchase 10 million 3M 1860 masks.  ALLEN told Investor-2 that he was setting up a supply chain to obtain masks from China.  Investor-2 informed ALLEN that his associate would be in touch with ALLEN to discuss logistics.  In fact, the associate was a law enforcement agent acting in an undercover capacity (the "UC").

23.     On April 11, 2020, the UC contacted the defendant DONALD ALLEN and identified himself as an associate of Investor-2.  During that telephone call, ALLEN indicated that he had "20,000 [masks] sitting in a warehouse in Santa Ana."  ALLEN further stated that he had another 200,000 of the "KNs" that had been "committed" to him and that the UC could also see 11 million "3-Plys" in "El Monte."  Based on the investigation to date,

I believe ALLEN was indicating that he had 20,000 KN95 Masks available for sale at a warehouse in Santa Ana, California and an additional 200,000 of the KN95 Masks that would be available to show the UC at a different location, along with 11 million 3-Ply Masks at a warehouse in El Monte, California.  At the conclusion of the April 11, 2020 call, ALLEN informed the UC that he would contact the UC at approximately 10:00 a.m. on Monday, April 13, 2020, to arrange a meeting to inspect the various masks.

24.     On April 13, 2020, the defendant DONALD ALLEN told the UC in a telephone call: "Listen, we have 2 million to go take a look at in Rancho Cucamonga tomorrow ... alright, ten o'clock, I will send you over the address to meet me at.  You will meet us at our mancave slash, uh, auxiliary office, and then we're about ten minutes from there."  ALLEN then provided the UC with the address for the "auxiliary office" (the "Office"), a single-family residence in Rancho Cucamonga, California, via text message.

<u>UC Meeting with the Defendants DONALD ALLEN and MANUEL REVOLORIO</u>

25.     On April 14, 2020, at about 10 a.m. local time, the UC arrived at the Office.  Upon arriving at the Office, the UC met the defendants DONALD ALLEN and MANUEL REVOLORIO, as well as an unidentified male who was introduced as a "sales manager" at the Office and a second unidentified male ("Associate-1").

26.     The UC entered the Office and observed a large number of cardboard boxes in plain view, some of which were open and contained face masks.  Others were sealed and shrink-wrapped.  The UC also observed a number of cardboard boxes on the back porch of the Office.  The defendants DONALD ALLEN and MANUEL REVOLORIO showed the UC various face masks and opened some boxes containing KN95 Masks and other face masks.  ALLEN and REVOLORIO allowed the UC to take photographs of the various masks.

REVOLORIO represented to the UC that the boxes on the back porch were filled with face masks.  In the presence of the UC, REVOLORIO (referred to as "MR" below) had the following conversation with Associate-1 (referred to as "A1" below):

MR:   Because we, uh, about how many boxes we have, 40 boxes out there, going out the door, right?  But this is sold already.

A1:   Yea.  They're going to pick it up today.

UC:   Okay.  So all that's all been spoken for.

A1:   Yeah, yeah.

During this meeting, REVOLORIO also advised the UC that he could sell the UC 40,000 KN95 masks:

MR:   I have, uh, twenty thousand -- twenty, twenty thousand, (ui), 40 thousand I can supply to you today.

UC:   40,000 KN95?

MR:   Yeah.

UC:   Okay.

27.    Based on the appearance of the boxes and the representations made by the defendants DONALD ALLEN and MANUEL REVOLORIO, the UC believed that the boxes UC observed in and immediately outside the Office were filled with face masks.  As described further below, most of the boxes, including those which were sealed and/or shrink-wrapped (and in some instances, were marked with "3M" labels), were actually empty.  Based on my training and experience, I believe that ALLEN and REVOLORIO staged the boxes and the conversation summarized above for the specific purpose of creating the false impression that all of the boxes at the Office were filled with face masks and that they

possessed more than 40,000 face masks, when, in fact, they only had a few thousand face masks.

28.     During the meeting at the Office, the defendants DONALD ALLEN and MANUEL REVOLORIO discussed, in sum, substance and part, their business and the fact that they had successfully completed multiple deals selling PPE.  Both men repeatedly stated that the protective masks sold very quickly.  REVOLORIO stated that "we're shipping a lot of inventory."  ALLEN stated that they had been in contact with a National Football League franchise in order to sell it masks.  ALLEN also stated that he and REVOLORIO had $24 million "on the way" for masks and that the money was currently on hold in Co-Conspirator-2's escrow account.  ALLEN and REVOLORIO also explained that they were "spot buying" masks and reselling them.  Based on my training and experience, I understand "spot buying" is the practice of buying to meet immediate requirements, rather than for stock or to meet future demand.

29.     During the meeting, the UC explained that the buyer represented by Investor-2 was going to "add a dollar" to the KN95 Masks and resell them to another individual.  The UC had the following conversation with the defendant DONALD ALLEN (referred to as "DA" below):

> UC:    I know the buyer, buyer's interested in the N95s, because he's gonna add a dollar to it and pass it to another guy ... And the same thing with the 3-Plys. He's not gonna add a dollar to it, but I think he's gonna have a good, good markup to it and then pass it on to somebody else.

> DA:    The 3-Plys are gonna get more and more popular, because there's nothing else.

Later on, the UC had a similar conversation with the defendant MANUEL REVOLORIO

("MR"):

>UC:     Yea, I know the guy who I'm -- the eventual purchaser,
>        he wants the N95s, because he's going add a buck to it
>        and ship it off to somebody else, ... and the same thing
>        with the 3-Plys.
>
>MR:     You'll see inventory, you know, he goes, but he comes
>        right back, like every week.  Right now, we're waiting
>        on 2 million KN95s. Right now, we want to see if your
>        people [Investor-2] want some of those, I can --
>
>UC:     Yea, like I said, I know they're interested in those,
>        because I thought, yeah, at some point, I think, there
>        was a discussion for a million, because, like I said, add a
>        dollar to each mask, that's a million dollars right there --
>        easy.
>
>MR:     Right, right.

During this meeting, REVOLORIO stated that they were adding "only" $0.20 to $0.30 per

mask.  Based on the context of this statement and other information learned in the course of

this investigation, I believe that REVOLORIO was referring to adding $0.20 or $0.30 to the

price of each of the 3-Ply Masks.

      30.     During the meeting at the Office, the defendant MANUEL

REVOLORIO advised the defendant DONALD ALLEN and the UC that they should be

heading to the warehouses in about 15 minutes.  Towards the end of the approximately 60

minute meeting, ALLEN asked REVOLORIO whether he should join REVOLORIO and the

UC for their trip to the warehouses.  REVOLORIO and ALLEN decided that ALLEN would

stay at the Office.

      31.     The defendant MANUEL REVOLORIO, Associate-1 and the UC then

departed the Office and headed to a large warehouse in Rancho Cucamonga, California (the

"Rancho Cucamonga Warehouse").  At the Rancho Cucamonga Warehouse, REVOLORIO

and the UC met with an individual who appeared to know REVOLORIO (the "Contact"), as

well as three unidentified men.  The Contact acted as the primary interpreter for conversations

between REVOLORIO, the UC and the three unidentified men, who spoke in a foreign

language.  Associate-1 remained outside of the warehouse for the duration of the meeting.  At

the Rancho Cucamonga Warehouse, the UC was shown numerous boxes and was told that the

boxes contained 500,000 3-Ply Masks.  The UC was also informed that another 2 million 3-

Ply Masks were located in the Rancho Cucamonga Warehouse, but in an area that could not

be currently accessed because the unidentified men did not have the key for that area.  The

UC was permitted to take several photographs of the boxes containing the 3-Ply Masks.

       32.    After the meeting at the Rancho Cucamonga Warehouse, the defendant

MANUEL REVOLORIO, Associate-1 and the UC travelled to a second warehouse in

downtown Los Angeles (the "LA Warehouse").  At the LA Warehouse, REVOLORIO

showed the UC a large number of boxes and advised the UC that the boxes contained a total

of approximately 1.2 million 3-Ply Masks.  The UC was permitted to take several

photographs of the boxes containing the 3-Ply Masks.

       33.    At the LA Warehouse, the defendant MANUEL REVOLORIO told the

UC that they had a large inventory of KN95 Masks and that they could hold 500,000 KN95

Masks for Investor-2.  REVOLORIO said, "the KN95s we get, but they leave the same day --

but we have the inventory, so just let us know how many you want."  A few minutes later,

REVOLORIO further stated: "So we can hold maybe half a million or something, but we got

people waiting on them."  The UC advised REVOLORIO that the UC would talk to Investor-

2 and that Investor-2 would handle any negotiations regarding the masks.  The UC then departed the LA Warehouse and the meeting with REVOLORIO concluded.

Communications During and After the UC Meeting

34.     On April 14, 2020, at about 11:40 a.m., at approximately the same time that the UC and the defendant MANUEL REVOLORIO were concluding their visit to the Rancho Cucamonga Warehouse, Co-Conspirator-2 called Investor-2.  Co-Conspirator-2 explained that the invoice "just came in," that the defendant DONALD ALLEN had met with the UC and that the UC "verified everything."  Co-Conspirator-2 said, "if it's a go, move the money and we'll take care of it.  And if not, let me know, because there is a line."  Co-Conspirator-2 said he had briefly spoken with ALLEN about ALLEN's meeting with the UC.

35.     At about 11:48 a.m., the defendant DONALD ALLEN emailed Investor-2 an invoice from ICIG for 2,500,000 "3 ply Face masks Respirators" at $0.74 each, for a total of $1,850,000.  The note section of the invoice states: "Please remit payment to the Law Offices of [Co-Conspirator-2]."

36.     At about 12:18 p.m., Co-Conspirator-1 sent a text message to Investor-2, asking for a call to discuss commission payments.

37.     At about 12:20 p.m., Investor-2 called Co-Conspirator-2 and Co-Conspirator-1.  Co-Conspirator-2 said that he, Co-Conspirator-1 and Investor-2 had not discussed what commission they would charge.  Co-Conspirator-1 said he thought they had agreed to a 10% commission but wanted to make sure everyone was on the same page.  Co-Conspirator-2 then suggested that they add $0.02 per mask to the invoice and split this commission three ways.  Co-Conspirator-1 suggested adding 10% to the $3.80 price of the "big masks" (the KN95 Masks) for a total price of $4.18.  Co-Conspirator-2 said he wanted

to discuss only the "little masks" (the 3-Ply Masks) "on the table today," that is, the 2.5 million 3-Ply Masks.  Investor-2 explained:

> As you guys know, my guy is going to put something on top and then flip them, because, obviously, um, if New York gets opened up in the next thirty days or so, these -- and everybody's got to wear a mask -- the price of these things are going to go up exponentially.  So all my guy wants to do is be able to, you know, tack on maybe $0.50 or maybe $1.00, who knows, and flip them and then do it again and again.

Co-Conspirator-2 then explained that he could tack on $0.02 per mask to the invoice by simply calling the defendant DONALD ALLEN and having the invoice include the commission going to Co-Conspirator-2, Co-Conspirator-1 and Investor-2.  Co-Conspirator-2 then suggested adding $0.02 or $0.03 per mask and splitting the commission three ways (i.e., between Co-Conspirator-2, Co-Conspirator-1 and Investor-2).  Investor-2 requested some time to think about how to best handle the commission.  Co-Conspirator-2 then suggested: "Just let me know, because I will get it put on the invoice and that way you don't even have to answer questions."  Investor-2 again requested additional time to think about this matter. Based on my training and experience, I believe that Co-Conspirator-2 was suggesting that commissions be added to the invoice price for the 3-Ply Masks in such a manner as to conceal those commissions, including Investor-2's commission, from the buyer represented by Investor-2.

38.     At about 1:19 p.m., Co-Conspirator-2 called Investor-2.  Co-Conspirator-2 said he had heard from the defendant DONALD ALLEN that there may be another 1.3 million masks at "that site the guy looked at" (i.e., the LA Warehouse).  Co-Conspirator-2 further stated that ALLEN could send another invoice to Investor-2's buyer if the buyer wanted all of them.

39.     At about 2:17 p.m., Investor-2 placed a telephone call to the defendant DONALD ALLEN.  Investor-2 said that he and the UC would purchase the 3-Ply Masks and asked for more information about the N95 Masks.[9]  ALLEN then added the defendant MANUEL REVOLORIO to the call.  REVOLORIO confirmed that he had met with the UC earlier that day.  Investor-2 then inquired about the KN95 Masks that REVOLORIO had mentioned to the UC.  REVOLORIO said that there were 2 million KN95 Masks and that he could offer maybe 500,000, because "everybody is waiting for that shipment."  REVOLORIO said that he would be receiving these masks "today, this afternoon" and that they would be ready to ship "tomorrow."  REVOLORIO said that usually it was the payment that held things up: "for example, we got a wire in on Friday, it's Tuesday right now, and the money still isn't in the account."  REVOLORIO explained that Investor-2 should wire the money to the Trust Account and Co-Conspirator-2 would then wire it to the manufacturer or the seller directly. REVOLORIO said that he had sold 60,000 KN95 masks this morning and had 500,000 for sale to Investor-2 at $3.80 each.  The 500,000 masks would be in a different warehouse "here locally".  REVOLORIO and ALLEN then asked Investor-2 how much they should "put on that for you" (add to the invoiced price).   Investor-2 responded: "I'm going to get my piece on the other end.  Like I said to you guys, my guy is just going to add $1 to and flip them, so I don't need to get anything there."  Investor-2 requested invoices and sales agreements and summarized the masks being offered: 2.5 million 3-Ply Masks, 1.3 million 3-Ply Masks and

---

[9] During the two telephone calls described in this paragraph, Investor-2 referred to "N95s", but it is clear from context that Investor-2 was referring to the KN95 Masks,

500,000 N95 Masks.  At the conclusion of the call, ALLEN said he would put "everything"

on an invoice and get the address for the third warehouse to Investor-2.

40.      At about 2:37 p.m., the defendant DONALD ALLEN sent another email

to Investor-2, copying Co-Conspirator-2, with the subject line: "3 Invoices."  ALLEN wrote,

"Gentlemen, Please find the attached 3 invoices for tomorrow morning's transaction.  I will

confirm transportation requirements shortly.  Don ALLEN [,] Vice President, [ICIG]."

Attached to the email were three invoices: (1) an invoice for 2,500,000 3-Ply Masks for $0.76

each, for a total of $1,900,000 (containing the same invoice number as the previously

provided invoice but with a $0.02 higher per mask price); (2) an invoice for 500,000 KN95

Masks at $3.80 each, for a total of $1,900,000; and (3) an invoice for 1,300,000 3-Ply Masks

at $0.76 each, for a total of $988,000.  Each of the invoices contained the following note:

"Please pay to the Law Offices of [Co-Conspirator-2.]"  Based on the investigation to date, I

believe that the quoted price of $0.76 represents the original price of $0.74 plus a $0.02 per

mask commission to be split by Co-Conspirator-2 and Co-Conspirator-1.

41.      On April 15, 2020, at about 9:40 a.m., the defendant DONALD ALLEN

sent another email to Investor-2, copying Co-Conspirator-2, with the subject line: "KN95

Invoice."  ALLEN wrote, "Gentlemen, Here is the KN95 Invoice."  Attached to the email was

one invoice from ICIG to the buyer represented by Investor-2 for 500,000 KN95 Masks for

$3.90 each, for a total of $1,950,000.  The invoice again contained the following note: "Please

remit payment to the Law Offices of [Co-Conspirator-2]."  I believe that the quoted price of

$3.90 represents the original price of $3.80 plus a $0.10 per mask commission to be split by

Co-Conspirator-2 and Co-Conspirator-1.

42.     Later that day, at about 5:12 p.m., Investor-2 called the defendant DONALD ALLEN.  Investor-2 explained that he was getting ready to send a wire for $4,838,000, but wanted assurances that ALLEN had the authority to sell the 2.5 million 3-Ply Masks, the 1.3 million 3-Ply Masks and the 500,000 KN95 Masks reflected in the invoices sent by ALLEN.  The following conversation occurred between Investor-2 (referred to as "I-2" below) and ALLEN (referred to as "DA" below):

I-2:     Obviously we haven't seen the KN95s, but I'm going to go on your word, but you --

DA:     Let me put it to you this way: I will not sell you or tell you about anything without it being there. ...

I-2:     Yea, so you have an agreement with the seller that you can or you have an agreement with the owner that you can sell these, correct?

DA:     Absolutely.

I-2:     Okay. Okay. So --

DA:     Yea, I put -- I put things under contract to my company and that's how we do this.  There's a contract that we sign, that we acquire it and then we resell.

I-2:     Yup. Okay, got it.  Alright, so with these three lots, you have an agreement in place with the owner that you can, you can resell them?

DA:     Absolutely.

As set forth below, ALLEN, REVOLORIO and/or ICIG did not have a contract or agreement with the owners of the masks, and statements about a contract or agreement were made to fraudulently induce Investor-2 to wire $4,838,000 to the Trust Account for the benefit of ALLEN and the defendant MANUEL REVOLORIO.

Execution of Search Warrants and Subject Interviews

43.     On April 17, 2020, the FBI executed a search warrant[10] at the Office and conducted voluntary interviews with the defendants DONALD ALLEN and MANUEL REVOLORIO.  At the same time, the FBI executed search warrants at the Rancho Cucamonga Warehouse and the LA Warehouse.[11]

44.     The search of the Office revealed, among other things, that most of the approximately 120 boxes in the living room and back porch were empty.  Most of the empty boxes had been resealed, shrink-wrapped and labelled, which created the impression that they were filled with protective masks.

45.     FBI Special Agents conducted a voluntary interview with the defendant DONALD ALLEN, who stated that ALLEN, the defendant MANUEL REVOLORIO and ICIG had been selling masks for approximately six weeks.  To date, they had made only three sales: (1) some masks were sold to REVOLORIO's sister in Boston; (2) 16 cases of masks were sold to a customer in Texas (the masks were purchased by ICIG for $1.25 and resold to the customer for $2.50 each); and (3) 10,000 KN95 Masks were sold to a couple in Florida (the masks were purchased by ICIG for $2.80 and resold to the couple for $3.30 each). ALLEN stated that the most recent sale occurred on April 13, 2020.  ALLEN further stated that the 3-Ply Masks intended to be sold to Investor-2 were to be purchased for $0.52 to $0.53 each and to be resold to Investor-2 for $0.76 each.  When he was asked about the mostly

---

[10] On April 15, 2020, the Honorable Jean Rosenbluth, United States Magistrate Judge, Central District of California, approved a search warrant for the Office, 20-MJ-1680.

[11] On April 16, 2020, the Honorable Michael R. Wilner, United States Magistrate Judge, Central District of California, approved search warrants for the Rancho Cucamonga Warehouse and the LA Warehouse, 20-MJ-1681 and 20-MJ-1682, respectively.

empty boxes at the Office staged in the living room and on the back porch, ALLEN advised

that REVOLORIO had put the boxes together.  ALLEN further denied that he was engaged in

price gouging.

      46.    FBI Special Agents also conducted a voluntary interview of the

defendant MANUEL REVOLORIO, who stated that ICIG started as a real estate business in

2017 and more recently began selling masks, and that the ICIG Website was created only last

week.  REVOLORIO further stated the first shipment of masks was made to REVOLORIO's

sister in Boston.  When REVOLORIO was asked about the statement on the ICIG Website

that ICIG had been in business since 2014, REVOLORIO admitted that the statement was not

true.  When asked about distribution centers advertised on the ICIG Website, REVOLORIO

said that they were still looking for suppliers.  When asked about whether he had contracts

with the owners of the masks offered to Investor-2, REVOLORIO gave vague and evasive

responses.  REVOLORIO told the interviewing agents that "we are not price gouging."

      47.    During their execution of the search warrant at the Rancho Cucamonga

Warehouse on April 17, 2020, FBI Special Agents discovered only approximately 33,305 3-

Ply Masks.  This quantity of 3-Ply Masks represented less than 1.5% of the 2.5 million 3-Ply

Masks that the defendant DONALD ALLEN had falsely informed Investor-2 that he had

under contract and available for Investor-2's purchase on April 16, 2020, and was also

significantly less than the approximately 500,000 3-Ply Masks that the UC was told were in

the boxes that he was shown at the Rancho Cucamonga Warehouse on April 14, 2020.

      48.    During the execution of the search warrant at the Rancho Cucamonga

Warehouse, FBI Special Agents interviewed two individuals present at the Rancho

Cucamonga Warehouse about the 3-Ply Masks.[12]  The individuals stated that the Rancho Cucamonga Warehouse was a single open warehouse and that, contrary to what the UC had been told on April 14, 2020, there was no separate locked area.  The individuals further advised that: (i) they were responsible for documenting deliveries and pick-ups of any 3-Ply Masks located at the Rancho Cucamonga Warehouse; (ii) the 3-Ply Masks were owned by a Chinese company; and (iii) these individuals had no knowledge of the defendants DONALD ALLEN, MANUEL REVOLORIO or ICIG.

49.     FBI Special Agents also recovered approximately 1.3 million 3-Ply Mask pursuant to their execution of the search warrant at the LA Warehouse on April 17, 2020.  Incident to that search, FBI Special Agents interviewed the owner of the LA Warehouse (the "Warehouse Owner").   The Warehouse Owner stated that he owned the approximately 1.3 million 3-Ply Masks and that he did not have a contract or agreement with ICIG or the defendants DONALD ALLEN and MANUEL RELOVORIO regarding the purchase of the approximately 1.3 million 3-Ply Masks.  The Warehouse Owner further stated that approximately 700,000 of the approximately 1.3 million 3-Ply Masks in the LA Warehouse had recently been sold to a third party.

50.     Because public filing of this document could result in a risk of flight by the defendants DONALD ALLEN and MANUEL REVOLORIO as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

---

[12]     The agents conducted the interviews with the assistance of a warehouse employee who served as an interpreter.

WHEREFORE, your affiant respectfully requests that arrest warrants be issued

for the defendants DONALD ALLEN and MANUEL REVOLORIO so that they may be dealt

with according to law.

Dated:   Brooklyn, New York
         April 22, 2020


_____
WILLIAM BOLINDER
Special Agent
Federal Bureau of Investigation


Sworn to before me this
22nd day of April, 2020


  /s Roanne L. Mann
_____
THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK